UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BAKEMARK USA LLC,

          Plaintiff,

    -against-

BRIAN NEGRON, et al.,

          Defendants.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/29/25
```

23-CV-2360 (AT) (BCM)

**CORRECTED MEMORANDUM AND ORDER COMPELLING ARBITRATION**

**BARBARA MOSES, United States Magistrate Judge.**

       In earlier proceedings before this Court, plaintiff BakeMark USA LLC (BakeMark) moved unsuccessfully for a preliminary injunction against its former employees Brian Negron (Brian) and Jose Negron Jr. (Jose Jr.) (collectively, the Individual Defendants) and two corporations owned and operated by Brian, Bakers Depot LLC (Bakers Depot) and JB Freight LLC (JB Freight) (collectively, the Corporate Defendants). Thereafter, the Individual Defendants (who are subject to arbitration agreements executed when they were BakeMark employees) agreed to arbitrate BakeMark's remaining damages claims before the American Arbitration Association (AAA). Now before the Court are: (1) a motion by the Individual Defendants for an award of their attorneys' fees and costs incurred in successfully opposing the preliminary injunction motion (Dkt. 141); and (2) a motion by BakeMark to compel the Corporate Defendants to arbitration. (Dkt. 147.) BakeMark also seeks to compel the Individual Defendants to arbitrate their fee motion. For the reasons that follow, both branches of BakeMark's motion to compel will be granted, thus mooting the Individual Defendants' fee motion.

## I.      BACKGROUND

       A detailed description of the facts underlying the parties' dispute is set out in *BakeMark USA LLC v. Negron*, 2024 WL 1075280, at *1-14 (S.D.N.Y. Jan. 12, 2024) (*BakeMark I*), *adopted*, 2024 WL 3385641 (S.D.N.Y. July 12, 2024) (*BakeMark II*), familiarity with which is assumed. In

this Memorandum and Order, I recount the relevant facts, and discuss the preliminary injunction

proceedings, only to the extent necessary to provide context for the motions now before me.

### A.    Facts

BakeMark is a national baking products distributor. *See BakeMark I*, 2024 WL 1075280,

at *3; Joint Stipulation of Undisputed Facts (Joint Stip.) (Dkt. 95) ¶ 1.[1] On April 2, 2021,

BakeMark acquired the assets of Sidco Food Distribution Corp. (Sidco), a smaller, New

York-based food distribution company, owned by the Negron family. Joint Stip. ¶ 6. In connection

with that acquisition, BakeMark hired a number of former Sidco employees, including the

Individual Defendants, Brian and Jose Jr., who were brought on as General Manager and Associate

General Manager, respectively, of BakeMark's Bronx Warehouse, which serviced New York City,

New Jersey, Pennsylvania, and Connecticut (the Territory). *Id.* ¶¶ 13-18.

On the day of the acquisition, the Individual Defendants signed identical Employment

Agreements with BakeMark, *see* Joint Stip. ¶¶ 21-25; along with identical (appended)

Non-Compete Agreements. *Id.* ¶¶ 26-36; *see also* Declaration of Judith A. Archer (Archer Decl.)

(Dkts. 149, 164-5) Exs. 3 & 4 (Dkts. 149-3 and 149-4) (Emp. Ags. and appended Non-Compete

Ags.).[2] The Non-Compete Agreements barred the Individual Defendants from disclosing or using

BakeMark's confidential information, including client, customer, vendor, and supplier

information, both during their BakeMark employment and for one year thereafter (or indefinitely

if the information qualified as a trade secret). Joint Stip. ¶ 27; Non-Compete Ags. § 4(a). The

Non-Compete Agreements also prohibited the Negron brothers from competing with BakeMark,

---

[1] The Joint Stipulation was submitted by the parties on August 17, 2023, in connection with
BakeMark's preliminary injunction motion.

[2] Dkt. 164-5 is a corrected version of the Archer Declaration, filed on December 20, 2024. The
corrections did not affect the exhibits to the Archer Declaration.

soliciting its customers (including former Sidco customers that had become BakeMark customers), or hiring its employees within the Territory for one year post-employment, with tolling provisions extending these restrictions if violated. Joint Stip. ¶¶ 31-34; Non-Compete Ags. §§ 6-9. The brothers stipulated that these terms were reasonable and that any breach would cause BakeMark "irreparable damage." Joint Stip. ¶¶ 35-36; Non-Compete Ags. §§ 11-12. In addition, the Non-Compete Agreements entitled BakeMark to "injunctive relief" in the event of a breach, and included a fee-shifting clause stating that "[t]he prevailing party in any such action shall be entitled to recover its reasonable costs and attorneys' fees." Non-Compete Ags. § 12.

On April 8, 2021, as a further condition of their BakeMark employment, the Individual Defendants signed identical Arbitration Agreements. Archer Decl. Exs. 5 & 6 (Dkts. 149-5 and 149-6) (Arb. Ags.). The Arbitration Agreements provided, among other things, that:

- "Company [BakeMark] and Employee agree to arbitrate before a neutral arbitrator any and all disputes or claims brought after the execution date of this Agreement, which would otherwise be subject to resolution in court, arising from or relating to Employee's recruitment to or employment with the Company, or the termination of that employment[.]" Arb. Ags. § 1.

- "Notwithstanding the foregoing, nothing in this Agreement prohibits either party from seeking provisional remedies in court in aid of arbitration including temporary restraining orders, preliminary injunctions, and other provisional remedies." *Id*.

- "The arbitration will be administered by AAA and will be conducted in accordance with the Employment Arbitration Rules and Mediation Procedures of the AAA ('AAA Rules') in effect at the time the written demand for arbitration was made." *Id*. § 4(d).

- "The arbitrator will follow the substantive law applicable to the case and may award only those remedies that would have been available had the matter been heard in court including, without limitation, punitive damages and attorneys' fees." *Id*. § 4(h).

- "This Agreement and its validity, construction and performance, as well as disputes and/or claims arising under this Agreement shall be governed by the Federal Arbitration Act or the laws of the State where the employee primarily

works or worked, whichever more comprehensively provides for the enforcement of this agreement." *Id.* § 4(i).

- "The Company and Employee shall each pay their own attorneys' fees . . . unless a statute or contract at issue in the dispute authorizes the award of attorneys' fees to the prevailing party, in which case the arbitrator shall have the authority to make an award of attorneys' fees as required or permitted by applicable law." *Id.* § 4(j).

While employed at BakeMark, the Individual Defendants were privy to its confidential information and trade secrets, including customer, pricing, and employee information. Joint Stip. ¶¶ 39-41.

On June 14, 2021, while Brian was still employed at BakeMark, he formed defendant JB Freight in New Jersey, and JB Freight began providing transportation services to customers, including BakeMark, that summer. Joint Stip. ¶¶ 70, 74-76. Although Brian was the sole member, manager, and registered agent of JB Freight, *id.* ¶ 121, he used a variety of subterfuges (including false names and addresses) to conceal his ownership of the new company from BakeMark. *See BakeMark I*, 2024 WL 1075280, at *6-7.[3]

On June 18, 2021, four days after forming JB Freight, Brian formed Bakers Depot in New Jersey. Joint Stip. ¶¶ 85-87. Brian is the sole member, manager, and registered agent of Bakers

---

[3] For example, when JB Freight applied to became a BakeMark vendor, it provided a false address and falsely gave the name of its "contact person" as "Danny." *BakeMark I*, 2024 WL 1075280, at *6. The false information was incorporated into a BakeMark "Vendor Add/Change/Delete Form," which Brian signed – for BakeMark – on the line for "Branch GM Approval." *Id.* A friend of Brian's (who had worked for him at Sidco and continued to work for him at BakeMark) then forwarded the Vendor Add/Change/Delete Form to BakeMark's California-based Procurement Manager, falsely stating that BakeMark had "used [JB Freight] in the past for all our NYC pickup needs[,]" but that it had somehow not been "carried over into the new system." *Id.* After JB Freight became a BakeMark vendor, Brian himself coordinated its pickups and deliveries at BakeMark, but he did so using a generic email address ("dispatch@myjbfreight.com") and signed his emails with a variety of false names, including "Bob," "Peter," and "Luis Antonio." *Id.*

Depot. *See id.* ¶ 121. Since their formation, JB Freight and Bakers Depot have shared the same premises, P.O. box, accountant, and payroll software license. *Id.* ¶¶ 90, 122-24.

On September 10, 2021, Brian resigned from BakeMark. Joint Stip. ¶ 37. On April 29, 2022, Jose Jr. followed suit and began working for Brian at Bakers Depot and JB Freight. *Id.* ¶ 38. Additionally, between January 2022 and March 2023, Brian hired at least seven former BakeMark employees (some of whom had also signed BakeMark non-compete agreements) to work for Bakers Depot and/or JB Freight. *See id.* ¶¶ 53-69; *BakeMark I*, 2024 WL 1075280, at *8-9. He also began using Bakers Depot and JB Freight to compete directly with BakeMark by selling baking products, within the Territory, to (among others) BakeMark customers. *See* Joint Stip. ¶¶ 90, 92-94; *BakeMark I*, 2024 WL 1075280, at *7-8.

Although Brian initially denied that Bakers Depot made any sales in the Territory, or contacted any of BakeMark's customers, until the "last two weeks of September" 2022, *see* Archer Decl. Ex. 13 (Dkt. 149-13) (Brian Dep. Tr.) at 298:23-299:12, 288:5-6, an accounts receivable report produced late in discovery, together with testimony adduced at the preliminary injunction hearing, showed that he "was using Bakers Depot and JB Freight to do business in the Territory, in direct competition with BakeMark, well before September 10, 2022, and that as part of that business he solicited and made sales of Competitive Products to Restricted Customers . . . as early as May 2022," which was "four months before [his] contractual restrictions could have expired." *BakeMark I*, 2024 WL 1075280, at *7; *see also* Archer Decl. Ex. 1 (Dkt. 149-1) (Hrg. Tr.) at 23:1-42:14 (Brian Negron, conceding on cross-examination that Bakers Depot made various sales

in the Territory, including to BakeMark customers, within one years of his departure from BakeMark); Archer Decl. Ex. 21 (Dkt. 149-21) (Hrg. Ex. P-112) (Account Receivables Report).[4]

In late 2022, after hearing "rumors" that several recently resigned BakeMark employees had begun working for the Negrons, *see* Joint Stip. ¶ 126, BakeMark launched an investigation, as a result of which it ultimately confirmed its suspicions, and additionally learned that JB Freight trucks were making deliveries, on behalf of Bakers Depot, to BakeMark customers. *Id.* ¶¶ 126-132. A few days after commencing this action, BakeMark also discovered that its password-protected "Memo History Report" (which this Court later determined to constitute a trade secret) had been downloaded and emailed between former BakeMark employees who had left to work for Brian at JB Freight and Bakers Depot. *Id.* ¶¶ 136-37; *see also BakeMark I*, 2024 WL 1075280, at *13 (noting that the purloined Memo History Report, run on August 5, 2022, showed, "for each BakeMark customer serviced by the Bronx Warehouse, every order placed by that customer during the period July 24-August 4, 2022, including the specific items and quantities purchased, the prices charged for those items, and BakeMark's cost"); Hrg. Tr. at 270:22-271:25, 274:11-13, 280:15-19 (BakeMark Senior Vice President Jeff Allen, testifying about the significance of the Memo History Report).

### B.    Procedural History

BakeMark commenced this action on March 20, 2023, asserting claims for breach of contract; breach of the covenant of good faith and fair dealing; misappropriation of trade secrets under the federal Defend Trade Secrets Act (DTSA) and under New York common law; breach of

---

[4] The transcript of the two-day preliminary injunction hearing is attached as Exhibits 1 and 8 to the Archer Declaration, and is consecutively paginated. Exhibits admitted at the preliminary injunction hearing are cited as Hrg. "Ex. P-__," or Hrg. Ex. D-__," depending on which party introduced them.

the duty of loyalty; unjust enrichment; and tortious interference with prospective business relationships and with contract. Compl. (Dkt. 1) ¶¶ 9, 109-204. Because plaintiff intended to "pursue claims in arbitration for damages," *id.* ¶ 1, it sought only injunctive relief and attorneys' fees in this Court. *Id.* ¶¶ 9, 123, 135, 149, 160, 181, 192. Along with its Complaint, BakeMark filed motion papers seeking preliminary injunctive relief and expedited discovery. (Dkts. 8-17.)

On June 26, 2023, Judge Torres referred the case to me to conduct an evidentiary hearing and issue a report and recommendation on plaintiff's preliminary injunction motion. (Dkt. 84.) After several adjournments, the Court held a two-day preliminary injunction hearing on Monday and Tuesday, August 28 and 29, 2023.

On August 25, 2023 – the Friday before the start of the preliminary injunction hearing – Bakers Depot filed for bankruptcy protection in the District of New Jersey. *See* Pet*., In re Bakers Depot LLC*, 23-BR-17425-VFP (Bankr. D.N.J. Aug. 25, 2023), ECF No. 1. Under the Bankruptcy Code, that filing triggered an automatic stay of civil litigation against Bakers Depot. Consequently, the preliminary injunction hearing proceeded only as to defendants JB Freight, Brian, and Jose Jr. *See BakeMark I*, 2024 WL 1075280, at *1 & n.1.

On January 12, 2024, I recommended that plaintiff's preliminary injunction motion be denied. *BakeMark I*, 2024 WL 1075280, at *1, 24. Although BakeMark had demonstrated a substantial likelihood of success on the merits of its contract and trade secrets claims, as against Brian Negron and JB Freight, I concluded that it had "failed to show that it would be irreparably injured in the absence of a preliminary injunction[,]" *id.* at *1, in part because it did not seek injunctive relief until "nine months after suspicions about the Negron Brothers' activities first arose and more than four months after a BakeMark employee provided compelling evidence . . . that Brian was operating a rival baking products distribution business" through the Corporate

Defendants, "employing former BakeMark workers, and selling to former BakeMark customers." *Id*. On July 12, 2024, Judge Torres adopted my recommendation and denied the preliminary injunction motion. *BakeMark II*, 2024 WL 3385641, at *1, 5.

On October 17, 2024, defendant JB Freight answered the Complaint. (Dkt. 136.)

On October 21, 2024, the parties stipulated that "this litigation shall be stayed as to the [Individual] Defendants with respect to any substantive claims that Plaintiff seeks to pursue against them herein, and that Plaintiff will instead commence a single arbitration proceeding against the Negron Defendants[.]" (Dkt. 137.) To date, there is no indication in the record that any arbitration proceeding has commenced.

On October 24, 2024, Bakers Depot's bankruptcy petition was dismissed, thereby dissolving the automatic stay. (Dkts. 138, 138-1.) On November 7, 2024, Bakers Depot filed its Answer (Dkt. 140 at ECF pp. 1-31), and asserted counterclaims against BakeMark for tortious interference with prospective economic advantage and unfair competition. *See* Bakers Depot Countercl. (Dkt. 140 at ECF pp. 31-41).

On November 15, 2024, the Individual Defendants moved for an award of their attorneys' fees and costs incurred in successfully opposing BakeMark's application for a preliminary injunction. (Dkt. 141.) Their fee motion relies upon § 12 of their Non-Compete Agreements and seeks a total of $284,236.44, which they describe as their "proportional share" of the total amount spent by all defendants during the injunction proceedings. (Dkt. 142 at 1, 17, 20.)

On November 22, 2024, BakeMark moved to compel the Corporate Defendants to arbitrate "all claims between BakeMark LLC and themselves," and for a stay of the proceedings pending arbitration. (Dkts. 147, 164-1.) In support of its motion, plaintiff filed a memorandum of law (Pl. Mem.) (Dkts. 148, 164-3), the Archer Declaration, with its attached exhibits, and a proposed order.

On December 5, 2024, BakeMark filed a memorandum of law in opposition to the Individual Defendants' fee motion, arguing, among other things, that "whether [they] are entitled to fees and expenses is a matter for the arbitrator, not this Court, to decide." (Dkt. 154 at 9.)

On December 10, 2024, defendants filed a memorandum of law in opposition to the motion to compel (Def. Opp.) (Dkt. 156), supported by the Declaration of Jason R. Finkelstein (Finkelstein Decl.) (Dkt. 157) and the Declaration of Brian Negron (Brian Decl.) (Dkt. 158), both with attached exhibits.

On December 19, 2024, the Individual Defendants filed their reply brief in further support of their fee motion (Dkt. 160), and plaintiff filed its reply brief in further support of its motion to compel (Pl. Reply) (Dkt. 162), supported by another attorney declaration (Dkt. 163) with exhibits.

On December 12, 2024, Judge Torres referred both motions to me, noting that the motion to compel arbitration is "non-dispositive." (Dkt. 159.)[5]

## C.    Claims and Counterclaims

### 1.    Claims

BakeMark asserts eight causes of action against defendants:

Claim 1, for breach of contract, alleges that the Individual Defendants, through the Corporate Defendants, violated their Employment and Non-Compete Agreements by poaching BakeMark employees, founding directly competing businesses, and using BakeMark's confidential information and trade secrets to solicit and obtain business from BakeMark customers. Compl. ¶¶ 110, 114. As a result, BakeMark alleges, it has lost customers, employees, profit, and market

---

[5] A motion to compel arbitration is within the authority of a magistrate judge "hear and determine" pursuant to 28 U.S.C. § 636(b)(1)(A) and Fed. R. Civ. P. 72(a). *See, e.g.*, *Legal Recovery Assocs. LLC v. Brenes L. Grp., P.C.*, 2023 WL 1382134, at *1 n.2 (S.D.N.Y. Jan. 31, 2023) (collecting cases).

share. *Id*. ¶ 118. Claim 2, for breach of the implied covenant of good faith and fair dealing, alleges that even if the Individual Defendants did not violate the express terms of their Employment and Non-Compete Agreements, they undermined the intent of those agreements by founding rival businesses, misusing confidential information, soliciting BakeMark's customers, and poaching BakeMark's employees. *Id*. ¶¶ 127-33.

Claims 3 and 4, for misappropriation of trade secrets pursuant to federal and New York law, allege that the Individual Defendants obtained and used confidential customer and pricing information to undercut BakeMark's prices and poach its customers. Compl. ¶¶ 143-45, 154-56.

Claim 5, for breach of the duty of loyalty, alleges that the Individual Defendants breached their fiduciary duty of loyalty that they owed to BakeMark while they were employed as managers, including by overcharging BakeMark for JB Freight's delivery services and by inducing BakeMark employees to leave for their competing businesses. Compl. ¶¶ 162-70.

Claim 6, for unjust enrichment, alleges that defendants JB Freight and Bakers Depot were created and operated in direct violation of the Individual Defendants' non-compete agreements and that they were unjustly enriched at BakeMark's expense, causing lost customers and revenue, and other competitive harm. Compl. ¶¶ 176-81.

Claim 7, for tortious interference with prospective business relationships, alleges that the Individual Defendants and the Corporate Defendants intentionally interfered with BakeMark's existing and prospective customer relationships by misusing BakeMark's confidential information and trade secrets. Compl. ¶¶ 187-90. Lastly, Claim 8, for tortious interference with contract, alleges that in poaching BakeMark's employees, the Corporate Defendants intentionally induced those employees to breach their own non-compete and confidentiality agreements. *Id*. ¶¶ 199-201.

### 2. Counterclaims

Bakers Depot asserts two counterclaims against BakeMark:

Counterclaim 1, for tortious interference with prospective economic advantage, alleges that since "at least March 2023," which is when this action was filed, BakeMark has "embarked on a deliberate, multi-faceted campaign to destroy Bakers Depot as a competitor." Countercl. ¶¶ 18, 42-44. For example, Bakers Depot alleges that BakeMark has demanded copies of Bakers Depot pricing lists and invoices from Bakers Depot customers, *id.* ¶¶ 19-21, then "temporarily agree[d] to sell to [those customers] at or below cost," so as to induce them to switch their loyalty. *Id.* ¶¶ 25-27. Bakers Depot further alleges that BakeMark has falsely "tarnish[ed]" its reputation, including by telling customers that it overcharges them, and that it will "shortly be out of business" due to the parties' pending litigation. *Id.* ¶¶ 25-31, 42.

Based on the same facts, counterclaim 2, for unfair competition, alleges that BakeMark has "sought to misappropriate Bakers Depot's commercial advantage" by improperly obtaining Bakers Depot's pricing information and customer names, then using that information to undercut Bakers Depot's business. Bakers Depot Countercl. ¶¶ 49-52.

### D. Plaintiff's Motion to Compel Arbitration

The Individual Defendants have agreed to arbitrate Claims 1-5, which run only against them. Plaintiff moves to compel arbitration of Claims 6-8, which run against the Corporate Defendants. It also asks this Court to compel arbitration of the pending fee motion, arguing that it is encompassed within the Individual Defendants' Arbitration Agreements. See Pl. Mem. at 23.

No party disputes the existence or the validity of the Arbitration Agreements as between BakeMark and the Individual Defendants. However, JB Freight and Bakers Depot were not signatories to those agreements. Invoking "traditional rules of contract and agency," Pl. Mem. at

11

11, BakeMark argues that this Court may nonetheless compel them to arbitrate all claims within the broad scope of the Arbitration Agreement because: (1) they received "direct benefits" from the Individual Defendants' Employment Agreements, and consequently are estopped from arguing that they need not comply with the appended Arbitration Agreements, *see id*. at 11-14; and/or (2) they are the alter-egos of Brian Negron. *See id.* at 14-22. The Corporate Defendants resist BakeMark's motion on the grounds that: (1) they received only "indirect" benefits from the contractual relationship between BakeMark and the Individual Defendants, which is not sufficient for direct benefits estoppel, *see* Def. Opp. at 13-16; and (2) they are independent businesses and not merely alter-egos of Brian. *See id*. at 16-21. Additionally, the Corporate Defendants argue that Bakers Depot's counterclaim is beyond the scope of the Individual Defendants' Arbitration Agreement, as is their fee motion. *Id*. at 22-23. Lastly, defendants argue that BakeMark has waived its right to compel arbitration by delaying the commencement of arbitration proceedings. *See id*. at 23-25.

## II.    LEGAL STANDARDS

Under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq*., agreements between parties to arbitrate their disputes are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract[.]" *Id*. § 2. In analyzing a motion to compel arbitration, the court must determine whether the parties agreed to arbitrate and whether their claims are within the "scope" of the arbitration agreement. *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 221 (2d Cir. 2019).[6] If these requirements are met, the court must "direct[] the parties to proceed to arbitration in accordance with the terms of the agreement[,]"

---

[6] In some cases, the court must also consider whether the plaintiff's federal statutory claims are exempt from the reach of the FAA. *Abdullayeva*, 928 F.3d at 221. That is not an issue here. *See N.Y. Knicks, LLC v. Maple Leaf Sports & Ent. Ltd.*, 2024 WL 3237563, at *10 (S.D.N.Y. June 28, 2024) ("There is no indication that Congress intended that DTSA . . . claims be nonarbitrable[.]").

9 U.S.C. § 4, and stay the litigation of the issues found "referable to arbitration," "until such arbitration has been had in accordance with the terms of the agreement[.]" *Id*. § 3; *see also Katz v. Cellco P'ship*, 794 F.3d 341, 347 (2d Cir. 2015) ("[T]he text, structure, and underlying policy of the FAA mandate a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested."). If the court determines that "some, but not all of the claims in the case are arbitrable," it must consider "whether to stay the balance of the proceedings pending arbitration." *Abdullayeva*, 928 F.3d at 221-22.

When determining a motion to compel arbitration, the court properly "considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, and draws all reasonable inferences in favor of the non-moving party." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (cleaned up); *see also Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 3d 357, 366 (S.D.N.Y. 2022) ("Courts routinely consider documents outside the pleadings when evaluating motions to compel arbitration[.]").

### A.    Enforcement Against Non-Signatories

Generally, "a gateway dispute about whether the parties are bound by a given arbitration clause raises a 'question of arbitrability' for a court to decide[,]" *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002), unless they have "clearly and unmistakably" provided otherwise. *Id*. at 83; *see also*, *e.g.*, *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250-51 (2d Cir. 2019) ("[T]hreshold questions of arbitrability presumptively should be resolved by the court and not referred to the arbitrator."). In this case, the "gateway dispute" is whether the Arbitration Agreements signed by the Individual Defendants bind the non-signatory Corporate Defendants. The agreements themselves do not speak to that issue. Consequently, arbitrability is a question for

the Court. *See Mobile Real Est., LLC v. NewPoint Media Grp., LLC*, 460 F. Supp. 3d 457, 479 (S.D.N.Y. 2020) ("[T]he issue of whether a non-signatory may be compelled to arbitrate is for the court to decide."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC*, 289 F. Supp. 3d 457, 465, 467 (S.D.N.Y. 2018) ("whether [a non-signatory] is to be a party to [an agreement] is an issue for judicial determination first.") (citations and quotation marks omitted).

### B.    Scope

Disputes about the scope of an arbitration agreement are also, presumptively, for the court to decide. *See Howsam*, 537 U.S. at 84 ("[A] disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court."). "[T]he party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000); *see also Legal Recovery Assocs.*, 2023 WL 1382134, at *4 (where "the parties agree on the existence of a valid arbitration clause but dispute its scope, the burden lies with the party opposing arbitration to demonstrate that the agreement is 'inapplicable' to the dispute at hand") (quoting *Marcus v. Collins*, 2016 WL 8201629, at *7 (S.D.N.Y. Dec. 30, 2016)).

If there are doubts as to the scope of the arbitration agreement, the courts "normally resolve any [such] doubts in favor of arbitration." *Abdullayeva*, 928 F.3d at 222 (cleaned up); *accord Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011). However, the presumption should only be applied where the arbitration agreement "is ambiguous about whether it covers the dispute at hand." *Applied Energetics*, 645 F.3d at 526 (quoting *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 301 (2010)); *see also Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 270 (2d Cir. 2015) ("the presumption of arbitrability is a tool for resolving genuine ambiguity, not a bias in favor of arbitration.").

14

### C.    Waiver

Federal law applies to the question whether a party has waived its right to arbitrate. *Morgan v. Sundance, Inc*., 596 U.S. 411, 416 (2022); *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 130-31 (2d Cir. 1997). Under federal law, a waiver may be found if the party moving to compel arbitration "knowingly relinquish[ed] the right to arbitrate by acting inconsistently with that right." *Morgan*, 596 U.S. at 419; *accord Brown v. Peregrine Enters., Inc*., 2023 WL 8800728, at *3 (2d Cir. Dec. 20, 2023) (summary order). "Waiver of a contractual right, including the right to arbitrate, 'is not to be lightly inferred.'" *Desarrolladora La Ribera v. Anderson*, 2024 WL 5186600, at *16 (S.D.N.Y. Dec. 20, 2024) (quoting *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 25 (2d Cir. 1995)); *see also Herrera v. Manna 2nd Ave. LLC*, 2022 WL 2819072, at *8 (S.D.N.Y. July 18, 2022) ("waiver should not be lightly presumed and must be based on a clear manifestation of intent to relinquish a contractual protection") (quoting *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 95 (2d Cir. 2015)).

"The party opposing the motion to compel arbitration bears the burden of showing waiver." *Diaz-Roa v. Hermes L., P.C.*, 757 F. Supp. 3d 498, 528 (S.D.N.Y. 2024). In considering a waiver argument, courts in this Circuit ordinarily focus on two factors: (1) "the time elapsed from when litigation was commenced until the request for arbitration," and (2) "the amount of litigation to date, including motion practice and discovery[.]" *Id.* (quoting *Brevard v. Credit Suisse*, 2024 WL 36991, at *8 (S.D.N.Y. Jan. 3, 2024)). "There is no bright-line rule, however, for determining when a party has waived its right to arbitration: the determination of waiver depends on the particular facts of each case." *Johnson v. Ensite USA, Inc*., 2022 WL 463381, at *4 (S.D.N.Y. Feb. 15, 2022) (citation and quotation marks omitted).

15

### D.    Stay

Where "some, but not all, of the claims in the case are arbitrable," the court must "determine whether to stay the balance of the proceedings pending arbitration." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 844 (2d Cir. 1987), *abrogated on other grounds by Rodriguez-Depena v. Parts Auth., Inc.*, 877 F.3d 122, 124 n.1 (2d Cir. 2017). "That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983); *accord Genesco*, 815 F.2d at 856. In determining whether to stay claims that are not subject to arbitration, the court properly considers "factors such as the desirability of avoiding piecemeal litigation and the degree to which the cases necessitate duplication of discovery or issue resolution." *Katsoris v. WME IMG, LLC*, 237 F. Supp. 3d 92, 110 (S.D.N.Y. 2017) (quoting *Maritima de Ecologia, S.A. de C.V. v. Sealion Shipping Ltd.*, 2011 WL 1465744, at *5 (S.D.N.Y. Apr. 15, 2011)).

"A discretionary stay is particularly appropriate where there is significant factual overlap between the remaining claims and the arbitrated claims." *Winter Invs., LLC v. Panzer*, 2015 WL 5052563, at *11 (S.D.N.Y. Aug. 27, 2015); *see also Argus Media Ltd. v. Tradition Fin. Servs. Inc.*, 2009 WL 5125113, at *3 (S.D.N.Y. Dec. 29, 2009) ("[N]umerous courts have held that where arbitrable and non-arbitrable claims arise out of the same set of facts, a stay usually is appropriate in the interest of judicial efficiency, because the arbitration may decide the same facts at issue in the litigation."). Additionally, stay orders are favored where "the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco*, 815 F.2d at 856.

## III.    DISCUSSION

### A.    Enforcement Against Non-Signatories

The Second Circuit has recognized five theories upon which a non-signatory may be bound to an arbitration agreement executed by an affiliated person or entity: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *See Thomson-CSF, S.A. v. Am. Arb. Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995). The party seeking to compel a non-signatory to arbitrate bears the burden of proving the applicability of one or more of the five listed theories. *Sheet Metal Workers' Int'l Ass'n Local Union No. 38 v. Custom Air Sys., Inc.*, 357 F.3d 266, 268 (2d Cir. 2004). Here, BakeMark argues that the Corporate Defendants should be compelled to arbitrate under either a direct benefit estoppel theory or a reverse veil-piercing/alter ego theory. I address each of these arguments in turn.[7]

### 1.    Direct-Benefit Estoppel

"Under the doctrine of direct-benefit estoppel, a party is estopped from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause." *McKenna Long & Aldridge, LLP v. Ironshore Specialty Ins. Co.*, 2015 WL 144190, at *9

---

[7] In passing, plaintiff raises the question whether New York or New Jersey law should apply to the veil-piercing/alter-ego analysis, since both Corporate Defendants are New Jersey LLCs. *See* Pl. Mem. at 14. However, as plaintiff notes, there is no "substantive difference" between the relevant laws of these two states. *Id.*; *see also Mohegan Lake Motors, Inc. v. Maoli*, 559 F. Supp. 3d 323, 338 n.4 (S.D.N.Y. 2021) ("[n]o conflict exists between the laws of New Jersey and New York for piercing the corporate form"), *opinion clarified sub nom. Mohegan Lake Motiors, Inc. v. Maoli*, 2023 WL 1070247 (S.D.N.Y. Jan. 27, 2023). Defendants do not contest this point, and do not advocate for the application of New Jersey law as to any of the issues in dispute. Accordingly, the Court will look to New York law. *See Int'l Bus. Machines Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004) ("In the absence of substantive difference, . . . a New York court will dispense with choice of law analysis; and if New York law is among the relevant choices, New York courts are free to apply it."); *Glob. Gaming Philippines, LLC v. Razon*, 2022 WL 836716, at *6 (S.D.N.Y. Mar. 21, 2022) (where "[b]oth parties rely on New York law in their memoranda of law," New York courts have allowed "New York law to [] guide the analysis[.]").

(S.D.N.Y. Jan. 12, 2015) (cleaned up). Direct benefits, as the label suggests, are those "flowing directly from the agreement," whereas "'the benefit derived from an agreement is indirect,' and is therefore insufficient to support estoppel, 'where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself.'" *Life Techs. Corp. v. AB Sciex Pte. Ltd.*, 803 F. Supp. 2d 270, 274 (S.D.N.Y. 2011) (quoting *Republic of Ecuador v. ChevronTexaco Corp.,* 499 F. Supp. 2d 452, 458 (S.D.N.Y. 2007), and providing examples).

Courts in this Circuit have recognized three circumstances under which a non-signatory directly benefits from an arbitration agreement executed by another: (1) where the benefit to the non-signatory was "specifically contemplated by the relevant parties;" (2) where the non-signatory "admit[s] to having directly benefited from an agreement containing an arbitration clause, for example by suing as a third-party beneficiary of that agreement;" and (3) where the agreement enables the non-signatory "to receive a tangible benefit, typically a financial benefit such as the receipt of legal fees, cheaper insurance rates, licensing fees, or the issuance of an insurance policy." *McKenna*, 2015 WL 144190, at *9 (collecting cases).

BakeMark's argument falls into the third category. BakeMark contends that JB Freight and Bakers Depot should be compelled to arbitrate because they "exploited multiple benefits under the Employment Agreements." Pl. Mem. at 12. First, plaintiff argues that Brian used his "management rights over BakeMark's Bronx Facility" to get JB Freight approved as a BakeMark vendor, after which, according to BakeMark, he charged inflated shipping rates, thereby generating profits for JB Freight. *Id*. at 12-13. Second, plaintiff argues that Bakers Depot benefited from the Negron brothers' access to BakeMark's confidential sales and customer data (as well as the "training to

understand and utilize that data," which it then used to poach BakeMark's employees and clients and compete against it. *Id*. at 13.

In opposition, defendants point out – and BakeMark does not seriously contest – that the Corporate Defendants' "benefits" stemmed from Individual Defendants' *violations* of their contractual and fiduciary duties, not from any rights or advantages intentionally (or even permissibly) conferred on the Corporate Defendants by the Employment and Non-Compete Agreements. Def. Opp. at 16. The Court agrees. While the record contains ample evidence that the Corporate Defendants *indirectly* benefited from *the contractual relationship* between BakeMark and the Individual Defendants (including by obtaining and allegedly using BakeMark's confidential customer, pricing, and vendor information to advance their competing businesses), those benefits were neither directly conferred on them by the Employment and Non-Compete Agreements nor contemplated by those agreements, which in fact prohibited the Individual Defendants from engaging in the conduct that benefited the non-signatories. Accordingly, while the Corporate Defendants "exploit[ed] the contractual relation of parties to an agreement," they did not "exploit (and thereby assume) the agreement itself.'" *Life Techs. Corp.*, 803 F. Supp. 2d at 274. I therefore conclude that the Corporate Defendants cannot be compelled to arbitrate under a direct-benefits estoppel theory.

### 2.    Veil-Piercing/Alter-Ego

Plaintiff's reverse veil-piercing/alter-ego theory fares better. In this Circuit, courts may pierce the corporate veil where the moving party shows that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury." *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 2025 WL 289499, at *2 (2d Cir. Jan. 24, 2025)

(*Citibank II*) (summary order) (quoting *Cortlandt St. Recovery Corp. v. Bonderman*, 31 N.Y.3d 30, 47, 73 N.Y.S.3d 95, 107 (2018) (internal quotation marks omitted)).

Whereas traditional veil piercing seeks "to hold individuals liable for the actions of a corporation they control[,]" reverse piercing "seeks to hold a corporation accountable for the actions of its [owners or] shareholders." *Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997). In both situations, courts are guided by the same equitable considerations. *See Miramax Film Corp. v. Abraham*, 2003 WL 22832384, at *6 (S.D.N.Y. Nov. 25, 2003); *Monteleone v. The Leverage Grp.*, 2009 WL 249801, at *3 (E.D.N.Y. Jan. 28, 2009).

> In determining whether complete domination exists, courts in the Second Circuit:
>
> consider such factors as: (1) disregard of corporate formalities; (2) inadequate capitalization; (3) intermingling of funds; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the degree of discretion shown by the allegedly dominated corporation; (7) whether the dealings between the entities are at arms length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of the corporation's debts by the dominating entity, and (10) intermingling of property between the entities.

*Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1053 (2d Cir. 1997) (citing *Wm. Passalacqua Builders, Inc. v. Resnick Devs. S., Inc.*, 933 F.2d 131, 139 (2d Cir. 1991)).

Veil-piercing determinations are "fact specific," and the analysis is tailored to "the circumstances of each case." *Thomson-CSF*, 64 F.3d at 776; *see also Shanghai Join Buy Co. v. PSTEX Grp., Inc.,* 2006 WL 2322648, at *3 (S.D.N.Y. Aug. 10, 2006) (noting the lack of "a definite test"). Thus, "[n]o one factor is decisive." *Freeman*, 119 F.3d at 1053. "Rather, a finding that a corporation is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Miramax*, 2003 WL 22832384, at *7 (noting reverse veil-piercing may be appropriate where the corporation is used as a "screen" for the dominating owner); *see also Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, 2002 WL 31885795, at *9 (S.D.N.Y. Dec. 27,

2002) ("the general principle followed by courts is that liability is imposed to reach an equitable result.") (internal quotation omitted).

Once the moving party has shown complete domination, it must show "that this domination was used to commit wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights, and that the control and breach of duty proximately caused the injury complained of." *Smoothline*, 2002 WL 31885795, at *11 (internal quotation omitted); *see also CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 316 F. Supp. 3d 635, 649 (S.D.N.Y. 2018) (same). However, the movant need not show that the owner's wrongful conduct was the exclusive cause of the injury suffered by the plaintiff. *See Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 714 F. Supp. 3d 416, 444 (S.D.N.Y. 2024) (*Citibank I*), *aff'd*, *Citibank II*, 2025 WL 289499, at *4; *Lakah v. UBS AG*, 2017 WL 7245365, at *91 (S.D.N.Y. Feb. 14, 2017).

Here, applying the *Passalacqua* factors and considering the totality of the circumstances, I conclude that Brian completely dominated JB Freight and Bakers Depot and that the LLCs' separate identities were disregarded. With respect to the first *Passalacqua* factor, during the relevant time period, Brian – the sole owner, member, and manager of both LLCs – ran them without concern for business formalities. As BakeMark points out, Brian failed to maintain records that are normally "part and parcel of the corporate existence," *Passalacqua*, 933 F.2d 131, 139, including, for example, documentation concerning Bakers Depot's employees, premises lease, shipments, and sales – including more than $88,000 in baking products sales between July and September 2022 for which he failed to produce any invoices. *See* Pl. Mem. at 17; *BakeMark I*, 2024 WL 1075280, at *8 n.16 (Bakers Depot had no payroll of its own); Hrg Tr. at 190:3-6 (Jose Jr., agreeing that "in the Negron family collection of companies, the fact that you're on the JB Freight payroll doesn't say much about who you're actually working for"); Brian Dep. Tr. at

203:12-204:4 (Bakers Depot had no lease for its New Jersey premises; "I just pay the rent."); Hrg. Tr. at 51:13-19 (Brian, conceding that he had "[n]o freight slip, no invoice, no driver's record" for a significant shipment, despite having been in operation for several months); *id.* at 56:14-18, 59:11-13 (Brian, conceding he had no documentation showing that 35,700 pounds of baking mix were sent by BakeMark from New York to Florida).

The records that Bakers Depot did keep (at the time of the preliminary injunction proceedings) were often curiously incomplete. *See, e.g.*, Hrg. Tr. at 218:9-15, 225:13-21 (BakeMark manager Carlos Afonso, testifying that Bakers Depot left invoices without any logo or other identifying information, because "they were trying to keep it hidden as long as they could"); Hrg. Ex. D-37 (examples of Bakers Depot invoices with no logo or name). Brian's spotty record-keeping (despite his own prior experience performing in-house accounting for Sidco, *see* Brian Dep. Tr. at 61:2-5, 151:7-12) creates at least an inference that he intentionally disregarded customary business formalities in order to disguise the fact that he was using Bakers Depot and JB Freight to unlawfully compete against BakeMark.

As to the second factor, there is some evidence in the record to suggest that the Corporate Defendants were inadequately capitalized. BakeMark points out that in January 2023 Brian made a personal loan to Bakers Depot in the amount of $1,250,000, *see* Archer Decl. Ex. 30, just seven months before the company filed for bankruptcy. Pl. Mem. at 17-18. On the other hand, BakeMark has taken the position that the bankruptcy filing was "a ploy to try to avoid an evidentiary hearing" in this action, Pl. Mem. at 7, and that Bakers Depot was never in genuine financial distress.[8]

---

[8] At the start of the preliminary injunction hearing on Monday morning, August 28, 2023, defendants requested that it be further adjourned – even as to the three non-debtor defendants – "to avoid 'touching on or affecting Bakers Depot's reorganization efforts that are protected by the automatic stay.'" *BakeMark I*, 2024 WL 1075280, at *2. I denied that request. *Id*. Thereafter, BakeMark took the position in the Bankruptcy Court that the case "was not filed in good faith

Consequently, I do not find either the loan or the bankruptcy filing to be sufficient evidence of inadequate capitalization.

Similarly, neither party makes any serious argument as to the third *Passalacqua* factor – the intermingling of personal and corporate funds. BakeMark suggests that Brian's $1.25 million loan to Bakers Depot was documented only after the fact. Pl. Mem. at 17-18. If true, this would provide further evidence that Brian disregarded corporate formalities, but would not show that he treated the company's funds or assets as his own. Similarly, although the Corporate Defendants are apparently footing the bill to defend the Individual Defendants in this action, *see* Archer Decl. Ex. 29, ¶ 5, it is common for business entities to defend their members, officers, directors, and/or senior employees in lawsuits arising out of the conduct of the entity, and not necessarily evidence that Brian improperly intermingled corporate and personal funds. I therefore place little weight on the third factor.[9] I note, however, that Brian was the signatory for both sides of the $1.25 million loan transaction, *see* Archer Decl. Ex. 30, which goes to the lack of arm's length dealing (the seventh factor), and the payment or guarantee of the company's debts by its owner (the ninth factor).

---

because there is no financial distress . . . it was filed merely to shield Brian Negron, Jose Negron, and JB Freight from liability." Finkelstein Decl. Ex. F, at 63:2-6.

[9] In a traditional veil-piercing analysis – where a corporate claimant or creditor is attempting to pierce the veil *upwards*, to impose liability on an owner who is unjustly relying on the corporate form to insulate what he claims to be his personal assets – courts often given substantial weight to this factor. *See, e.g.*, *Push, Inc. v. Prod. Advisors, Inc.*, 2010 WL 1837776, at *4 (S.D.N.Y. Apr. 15, 2010) (emphasizing evidence that the sole shareholder treated the corporation as "his personal bank account[]"). However, no "one factor or [] combination of factors [is] necessarily determinative," *Miramax*, 2003 WL 22832384, at *8, and the appropriate standard for piercing the corporate veil for one purpose may not properly extend to a different purpose. *Id.* at *7. Here, by contrast, plaintiff urges the Court to pierce the veil in reverse, not for liability purposes, but rather to compel the Corporate Defendants to arbitration along with the Individual Defendants. Considering the unique facts and equities of the case before me, I find it appropriate to give more weight to the fourth through seventh factors, which demonstrate that Brian exercised unitary and unfettered decision-making authority over every aspect of the Corporate Defendants' operations, including "the transaction[s] attacked." *Citibank II*, 2025 WL 289499, at *2.

More generally, the fourth, fifth, and sixth factors – overlap in ownership, officers, directors, and personnel, common office space and contact information, and "degree of discretion" left to the allegedly dominated corporation – all weigh in favor of finding that Brian completely dominated both Corporate Defendants. It is undisputed that he was the sole owner, member, and manager, and "authorized representative" of both companies, and that he exercised sole decision-making authority over both, without any oversight from a board (there was none), other members (there were none) or any mitigating management structure. *See Bakemark I*, 2024 WL 1075280, at *13 n.22; Joint Stip. ¶ 121; Brian Decl. ¶ 4 & Ex. G; Finkelstein Decl. Ex. D. Thus, for example, it was Brian (in his capacity as sole Member of Bakers Depot) who gave Brian (in his capacity as President of Bakers Depot) the authority to put Bakers Depot into bankruptcy (and hire counsel for that purpose). *See* Finkelstein Decl. Ex. E. Likewise, it was Brian (presumably in his capacity as President) who agreed that Bakers Depot would borrow $1.25 million from Brian as of January 1, 2023, but pay no interest until September 1 of that year. Archer Decl. Ex. 30. And it must have been Brian who decided that his defense costs in this action (and his brother's) would be charged to Bakers Depot. These facts also go to the seventh factor, and show that the dealings between Brian and the Corporate Defendants were not at arms' length.

Brian also had (and exercised) the ability to move resources between Bakers Depot and JB Freight, which he did by leasing common premises for both of the Corporate Defendants, *see* Joint Stip. ¶ 91, and putting all of his employees on the JB Freight payroll – but assigning them to work for Bakers Depot as he saw fit. *See Bakemark I*, 2024 WL 1075280, at *8-9 & n.16; *id.* at *17 (noting that the Corporate Defendants "operat[ed] out of the same premises and – until recently – shared a single pool of employees, paid through a single payroll, regardless of what services, for which entity, those employees performed"); Joint Stip. ¶¶ 94-120 (detailing work carried out by

JB Freight employees on behalf of Bakers Depot). Brian also put his parents on the payroll, *see* Hrg. Ex. P-119, "for medical," although "they don't actively work" for JB Freight or for Bakers Depot. *See* Hrg. Tr. at 87:14-21 (Brian)*; id*. at 167:6-7 (Jose Jr.).

Taken together, these facts support the conclusion that Brian exercised complete domination over both Corporate Defendants. *See, e.g., Monteleone*, 2009 WL 249801, at *3 (finding reverse veil-piercing appropriate where individual defendant "completely dominate[d] the [corporate defendants] as the sole shareholder and the only officer and director" and there was "no evidence that any corporate defendant operated independently of [him] in any way."); *accord Amerio v. Gray*, 2020 WL 4192618, at *18 (N.D.N.Y. July 21, 2020) (declining to pierce the corporate veil where plaintiffs failed to establish "that any one [individual] truly dominated [the corporation's] operations."); *Am. Fuel*, 122 F.3d at 135 (emphasizing the fact that a 50% co-owner "actively participated in [the] business and had at least as much involvement in, and control over, the company" to deny reverse veil-piercing).

To satisfy the second prong of the veil-piercing test, BakeMark must show that Brian's domination over the Corporate Defendants was used to commit a fraud or wrong, which resulted in BakeMark's injury. *Am. Fuel.*, 122 F.3d at 134; *Freeman*, 119 F.3d at 1052. While "a simple breach of contract, without more, does not constitute a fraud or wrong warranting the piercing of the corporate veil," *Citibank I*, 714 F. Supp. 3d at 444 (citation and quotation marks omitted), in this case the record contains ample evidence that Brian used the Corporate Defendants not only to compete against BakeMark in the Territory, solicit its employees, and poach its customers – all in violation of his contractual obligations – but also to misappropriate valuable BakeMark trade secrets, which were covertly transmitted to at least two of Brian's subordinates who were on the JB Freight payroll while also performing work for Bakers Depot. *See* Joint Stip. ¶¶ 136-137;

*BakeMark I*, 2024 WL 1075280, at *20 (finding that BakeMark was likely to succeed on its trade secret claims against Brian and JB Freight because there was "direct evidence that a valuable BakeMark trade secret made its way, surreptitiously, to at least two of Brian's direct reports at JB Freight").[10]

Even before he resigned from BakeMark, Brian used JB Freight to induce his then-employer into hiring him (through JB Freight) as a transportation vendor, without revealing his connection to the new vendor or the conflict of interest inherent in the transaction. *See BakeMark I*, 2024 WL 1075280, at *6. This conduct, standing alone, was fraudulent – whether or not JB Freight then overcharged BakeMark for its transportation services, as BakeMark alleges. Thus, taken as a whole, the evidence shows that Brian's conduct went far beyond a "simple breach of contract." He used the Corporate Defendants not only to evade the clear restrictions placed upon him by his Employment Agreement and Non-Compete Agreement, but also to trick BakeMark into using JB Freight as a vendor and to misappropriate BakeMark's confidential information and trade secrets for the benefit of his competing businesses. This conduct constitutes a "wrong, fraud, or the breach of a legal duty, or a dishonest and unjust act," causing injury to BakeMark. *Smoothline*, 2002 WL 31885795, at *11; *see also Freeman v. Complex Computing Co.*, 979 F. Supp. 257, 261 (S.D.N.Y. 1997) (holding, on remand from the Court of Appeals, that non-signatory Frazier was required to arbitrate with plaintiff because he completely dominated the signatory corporation, C3, and used that domination "to impair Freeman's ability to enforce C3's obligations to him[.]").

---

[10] As noted above, this Court did not make any recommendation as to BakeMark's claims against Bakers Depot in *BakeMark I*, and Judge Torres did not make any findings as to those claims in *BakeMark II*, because Bakers Depot was, at the time, protected by the automatic stay attendant upon its bankruptcy filing.

Since BakeMark has shown that Brian completely dominated the Corporate Defendants and that "such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury," *Citibank II*, 2025 WL 289499, at *2, BakeMark is entitled to pierce the corporate veil for the purpose of compelling the Corporate Defendants to arbitrate its claims against them.

**B.    Scope**

**1.    Attorneys' Fee Motion**

It is undisputed that the Individual Defendants' Non-Compete Agreements entitle BakeMark to "injunctive relief" in the event of a breach or threatened breach of certain provisions of that contract, and further entitle "[t]he prevailing party in any such action" to "reasonable costs and attorneys' fees." Non-Compete Ags. § 12. It is further undisputed that the Individual Defendants' Arbitration Agreements, although otherwise couched in very broad language (requiring the parties to arbitrate "any and all disputes . . . arising from or relating to the Employee's recruitment to or employment with [BakeMark]"), contain a carve-out permitting any party to seek "provisional remedies in court in aid of arbitration including temporary restraining orders, preliminary injunctions, and other provisional remedies." Arb. Ags. ¶ 1(a). The parties disagree, however, as to whether the Individual Defendants' pending fee motion falls within the broad scope of their agreement to arbitrate (in which case it must be decided by the arbitrator) or is part and parcel of the carve-out for "provisional remedies in aid of arbitration" (in which case it can be decided by this Court). *Compare* Pl. Mem. at 23 ("The motion for attorneys' fees falls within the extremely broad scope of the Arbitration Agreement to arbitrate 'any and all disputes'") *with* Def. Opp. at 22 ("[T]he agreements clearly reflect the intent for any attorneys' fees application to be heard in the court hearing the provisional remedy case.")

To resolve this dispute, the Court looks to the language of the agreements. *See Contec Corp. v. Remote Sol., Co., Ltd.*, 398 F.3d 205, 208 (2d Cir. 2005). That language is clear and unambiguous. The carve-out includes motions for temporary restraining orders, preliminary injunctions, and "other provisional remedies." Arg. Ags. ¶ 1(a).[11] A fee award is not a provisional remedy. Nor can it be sensibly characterized as a remedy "in aid of arbitration," as it is not necessary to "preserve the status quo pending arbitration." *Blumenthal*, 910 F.2d at 1054. The fact that the fee motion seeks fees incurred in connection with the (now-adjudicated) preliminary injunction motion does not turn the fee motion itself into a motion for a provisional remedy or a motion in aid of arbitration. I note as well that the Arbitration Agreement explicitly gives the arbitrator the authority to award, among other things, "attorneys' fees." Arb. Ags. § 4(h); *see also id.* § 4(j) (providing that "the arbitrator shall have the authority to make an award of attorneys' fees" where "a statute or contract at issue in the dispute authorizes the award of attorneys' fees to the prevailing party[.]"). I therefore conclude that the fee motion falls within the broad scope of the Arbitration Agreement and must be decided by the arbitrator.[12]

### 2.    Counterclaims

In their opposition brief, defendants assert that Bakers Depot's counterclaims for tortious interference and unfair competition "are unrelated 'to Employee's recruitment to or employment with the Company, or the termination of that employment,'" and therefore that even if Bakers

---

[11] The purpose of such a carve-out is to "preserve the status quo pending arbitration" and prevent arbitration from "becom[ing] a 'hollow formality' if parties are able to alter irreversibly the status quo before the arbitrators are able to render a decision in the dispute." *Blumenthal v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 910 F.2d 1049, 1053 (2d Cir. 1990); *accord Thales Avionics, Inc. v. L3 Techs., Inc.*, 719 F. Supp. 3d 337, 345 (S.D.N.Y. 2024).

[12] Even if the language of the Arbitration Agreement were ambiguous on this point, I would resolve that ambiguity in favor of compelling arbitration. *Abdullayeva*, 928 F.3d at 222; *Applied Energetics,* 645 F.3d at 526.

28

Depot were subject to the Arbitration Agreement, it could not be compelled to arbitrate its counterclaims. Def. Opp. at 22 (quoting Arb. Ags. ¶ 1(a)). In its moving papers, plaintiff did not argue otherwise. Instead, plaintiff sought only to compel arbitration of *its* claims *against* the Corporate Defendants. *See* Pl. Mem. at 1.[13] Accordingly, Bakers Depot's counterclaims against BakeMark will not be compelled to arbitration. Instead, as discussed below, they will be stayed pending arbitration of the parties' remaining claims.

### C.    Waiver

The Corporate Defendants argue that even if they would otherwise be subject to arbitration, BakeMark's motion to compel should be denied because it "has yet to commence arbitration against the Individual Defendants or the Corporate Defendants," and consequently has waived its right to do so. Def. Opp. at 24. Defendants concede that BakeMark was barred from proceeding against Bakers Depot in any forum – due to the bankruptcy stay – "between August 2023 and September 2024," but contend that plaintiff had "no justification" for its failure to commence arbitration against the other defendants. *Id.*[14] BakeMark responds that it could not have waived its right to arbitrate by pursuing provisional remedies in aid of arbitration in this Court, because those remedies were expressly permitted by the Arbitration Agreements. Pl. Reply at 10.

Plaintiff has the better end of the argument. Nothing that it has done in this Court was inconsistent with its right to arbitrate, much less evidenced a knowing relinquishment of that right. *See Morgan*, 596 U.S. at 419. When BakeMark initiated this action on March 20, 2023, it noted

---

[13] In its reply brief, BakeMark argues for the first time – in a footnote – that the Bakers Depot counterclaims are also subject to arbitration. Pl. Reply at 8 n.8. However, "[c]ourts have repeatedly held that arguments raised for the first time in reply briefs are waived[.]" *Farmer v. United States*, 2017 WL 3448014, at *3 (S.D.N.Y. Aug. 10, 2017) (Nathan, J.) (collecting cases).

[14] In fact, the bankruptcy proceeding was not dismissed until October 24, 2024. (*See* Dkt. 138-1.)

that it was seeking preliminary injunctive relief pursuant to ¶ 1(a) of the Arbitration Agreements and that it intended to arbitrate the remainder of its claims. Compl. ¶ 1. The preliminary injunction motion was resolved on July 12, 2024, when the District Judge denied it. Six weeks later, on August 22, 2024 (even before the Bakers Depot bankruptcy proceeding was dismissed), plaintiff reaffirmed its intent to pursue arbitration against the Individual Defendants and notified the Court that it was "exploring the legal bases upon which [the Corporate Defendants] may be compelled to arbitration," since they refused to arbitrate voluntarily. (Dkt. 124 at 3.) Once the Court set a briefing schedule for plaintiff's motion to compel arbitration (*see* Dkt. 130), plaintiff complied with it.

It is true that the proceedings in this Court involved "extensive discovery and an evidentiary hearing." Def. Opp. at 24. However, both the discovery (which was expedited) and the hearing were required in order to determine whether BakeMark was entitled to a provisional remedy "in aid of arbitration," as expressly permitted by the Arbitration Agreements. Moreover, although BakeMark was slow to file this action, *see BakeMark I*, 2024 WL 1075280, at *24, once it did so it made vigorous efforts to pursue its preliminary injunction motion swiftly.[15] BakeMark's conduct in this Court thus could not have constituted a waiver of its right to arbitrate upon completion of those proceedings.

Even if the proceedings in this Court were not conducted "in aid of arbitration," the mere passage of time would not be sufficient, without more, to constitute a waiver. *See, e.g.*, *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002) (refusing to find waiver

---

[15] While the parties received numerous extensions of their expedited discovery and pre-hearing briefing deadlines, most of the extension requests came from defendants (*see* Dkts. 37, 39, 52, 60) and were opposed by plaintiff. (*See* Dkts. 40, 53, 61.) Other extension requests were made jointly by the parties. (*See* Dkts. 55, 86.)

after an almost two-year delay) (collecting cases); *Boustead Sec., LLC v. Leaping Grp. Co.*, 656 F. Supp. 3d 447, 452 (S.D.N.Y. 2023) (finding no waiver despite "[t]he fact that ATIF waited over two years to request arbitration"); *Lawrence v. NYC Med. Prac., P.C.*, 2023 WL 4706126, at *15 (S.D.N.Y. July 21, 2023) (finding that a two-year delay, in a case pending more than three years, did not constitute waiver). I therefore conclude that defendants have not carried their "burden of showing waiver." *Diaz-Roa*, 757 F. Supp. 3d at 528.

### D.    Stay

Under the FAA, this Court must stay litigation of the claims found "referable to arbitration" pending the outcome of that arbitration. 9 U.S.C. § 3. Defendants argue that the stay should not extend to its counterclaims, which it wishes to litigate in this Court in parallel with the arbitration of the claims against it. Def. Opp. at 25. After considering all of the relevant factors, I conclude that a stay of the entire action is appropriate.

As Bakers Depot acknowledges, both of its counterclaims "arise out of the same transactions and/or occurrences that are the subject matter of BakeMark's [] claims" against it, and "as such, form the same case and controversy." Bakers Depot Countercl. ¶ 5. Indeed, the counterclaims are, to some degree, mirror images of BakeMark's claims, with each baking products distributor contending that the other engaged in unlawful competition against it, particularly with respect to the small bakeries and bodegas that formed Sidco's customer base prior to its acquisition by BakeMark. Indeed, some of the customers that Bakers Depot accuses BakeMark of trying to win over through unfair tactics are the same "Restricted Customers" that BakeMark accuses defendants of soliciting in violation of the Individual Defendants' Employment and Non-Compete Agreements. *See*, *e.g.*, Bakers Depot. Countercl. ¶¶ 21, 24 (Daisy's Bakery), *id.* ¶¶ 25-27 (El Panadero Bakery).

Given the "significant factual overlap" between the claims that must be arbitrated and those potentially remaining for litigation, *Winter Invs.*, 2015 WL 5052563, at \*11, it would be wildly inefficient for the parties to proceed on two tracks simultaneously. Such a course would multiply the parties' costs, provide ample opportunities for duplicative discovery, and "create the possibility of inconsistent outcomes." *Hughes, Hooker & Co. & Hughes, Hooker (Correspondents) S.A. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.*, 2005 WL 1384055, at \*6 (S.D.N.Y. June 9, 2005).[16] The fact that "the arbitrable claims predominate the lawsuit," *Genesco*, 815 F.2d at 856, also militates in favor of a stay in this forum.

## IV.    CONCLUSION

For the reasons set forth above, plaintiff's motion to compel arbitration (Dkt. 147) is GRANTED as to plaintiff's claims against the Corporate Defendants and as to the Individual Defendants' fee motion (Dkt. 141), which is therefore administratively DENIED, without prejudice to renewal before the AAA. The counterclaims asserted by Bakers Depot against plaintiff need not be arbitrated, but are hereby STAYED, along with all of plaintiff's claims, pending the outcome of the arbitration. The parties must file a joint status letter no later than **March 30, 2026**, and every six months thereafter, updating the Court as to the progress of the arbitration proceedings.

The Clerk of Court is respectfully directed to terminate the motions at Dkts. 141 and 147.

Dated:  New York, New York          **SO ORDERED.**
        September 29, 2025

_____
**BARBARA MOSES**
**United States Magistrate Judge**

---

[16] For similar reasons, even if BakeMark were not entitled to compel arbitration of its claims against the Corporate Defendants, it would be entitled to a stay of those claims pending arbitration of its near-identical claims against the Individual Defendants. *See Desarrolladora*, 2024 WL 5186600, at \*24-25 (staying the entire action where arbitration of some claims would "necessarily resolve most of the issues underlying" the remaining claims).